```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS


NORTHERN ASSURANCE COMPANY        )
OF AMERICA                        )
                                  )
     Plaintiff,                   )
                                  )      CIVIL ACTION NO.
v.                                )      09-10654-DPW
                                  )
CAROLE AND DENNIS HEARD,          )
TOWN OF WINTHROP and MASSACHUSETTS )
INTERLOCAL INSURANCE ASSOCIATION  )
                                  )
     Defendants.                  )
```

MEMORANDUM AND ORDER
November 10, 2010

The question presented in this case is whether the owners of a recreational sailboat may recover detention damages for loss of the vessel's use during their planned vacation. A late nineteenth century Supreme Court case contains categorical language on the question, leading circuits which have recently addressed the issue to conclude that detention damages are available only upon proof of loss of commercial profits and not for loss of recreational use. In two earlier readings of the case more hospitable to the recognition of recreational loss, Judge Learned Hand and thereafter Justice Cardozo, suggested that there is no meaningful difference to be found in any distinction between loss of use for profit or for recreation. Judge Hand and Justice Cardozo reasoned that the determinative issue should be whether the damages from the loss of use for either purpose can

1

be proven adequately.  Although I find the approach of Judge Hand and Justice Cardozo persuasive as a policy matter, the categorical imperative denying recovery for recreational loss has never been expressly abandoned by the Supreme Court. Accordingly, I must reluctantly allow summary judgment against the vessel owners here leaving unresolved the issue whether they can, in fact, prove the value of their recreational loss.

## I. THE RISE AND FALL OF THE RENAISSANCE

During the summer of 2007, Carole Heard, a postal worker, and her husband Dennis, who worked for the Massachusetts Bay Transportation Authority, arranged their vacations so that they could use their boat the RENAISSANCE for 10 weeks from July 26, 2007 through October 8, 2007.  The RENAISSANCE, variously described in the record as a 46 to 50 foot sloop, was built in 1981.  The Heards purchased her in 2002, rebuilt her over several years and then relaunched her late in 2006.

On July 25, 2007, just as the vacation period was to begin, the RENAISSANCE was damaged when the Harbor Master's boat for the Town of Winthrop allided[1] with it.  The RENAISSANCE was towed to

---

[1] An allision involves contact by a moving vessel, here the Harbor Master's craft, with a stationary vessel, here the RENAISSANCE.  By contrast, a collision occurs when there is contact between two moving vessels.  The term *allide* "is used only in a special context in reference to ships in admiralty law. When two ships *allide*, one of them is stationary; ships *collide* when both are moving before impact."  BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 44 (2d ed. 1995) (emphasis in original). Garner, who is also editor-in-chief of the current BLACK'S LAW

a boat yard until repairs were completed in the spring of 2008.

The Heards sought a bareboat charter replacement, but found the $5,000 per week charge for a comparable vessel beyond their reach. When they claimed reimbursement for the loss of use of the RENAISSANCE during their planned vacation, they were rebuffed by their insurer, Northern Assurance. In this litigation, Northern Assurance and the Heards seek distribution of insurance money available from the Town of Winthrop, with the Heards contending they should receive payment from these funds for the loss of use of their vessel.[2]

---

DICTIONARY, has more recently observed that "[i]n modern practice, 'collision' is often used where 'allision' was once the preferred term." BLACK'S LAW DICTIONARY 88 (9th ed. 2009).

[2] The instant litigation was brought by the Heards' insurer, as subrogee. Northern Assurance paid $115,636.09 to repair the physical damage to the RENAISSANCE. The Town of Winthrop agreed to settle the subrogation claim of Northern Assurance for the statutory limitation of $100,000 on damages caused by public employees acting within the scope of employment. MASS. GEN. LAWS ch. 258, § 2. The monies have been paid into the Registry of this Court. Because settlement recovery from the Town of Winthrop is less than the repair costs for the RENAISSANCE when coupled with the detainer damages claimed by the Heards, this case decides whether Northern Assurance may retain the entire $100,000 settlement amount or must share the recovery on a pro rata basis such as that which would be established if the Heards were able to prove their asserted detention loss of $50,000.00. Assuming detention loss in that amount were compensable and proven in this case, the total damages sustained by the two parties would be $165,636.09, and the pro rata allocation (69.8% to Northern Assurance; 30.2% to the Heards), would result in an award, without inclusion of accrued interest, of $69,800 to Northern Assurance and $30,200 to the Heards.

## II. THE WAKE OF *THE CONQUEROR*

At the end of the nineteenth century, the Supreme Court declined to award what it called "demurrage"[3] to Frederick W. Vanderbilt, the immensely wealthy grandson of the Commodore, *see generally* T.J. STILES, THE FIRST TYCOON: THE EPIC LIFE OF CORNELIUS VANDERBILT (2009), for the improper detention by customs authorities of his foreign built pleasure yacht after it had been sailed across the Atlantic. *The Conqueror*, 166 U.S. 110 (1897). The Supreme Court rejected the customs duty grounds for the detention, holding that it was not the intention of Congress to make such a "seagoing, schooner rigged, screw steamship, 182 ½ feet long, nearly 25 feet wide, and of 372 tons burden" a dutiable article. *Id.* at 114-121.

The district court had awarded $21,742.24 in damages to Mr. Vanderbilt for losses arising out of the improper detention of the CONQUEROR, $15,000 of which was "for loss of use of the boat while detained" at a rate of $100 per day. *Id.* at 125 (internal

---

[3] The Supreme Court in *The Conqueror,* 166 U.S. 110 (1897), said "the loss of profits or of the use of a vessel pending repairs, or other detention, arising from a collision or other maritime tort, [is] commonly spoken of as 'demurrage.'" *Id.* at 125. Professor Schoenbaum has cautioned that "recovery known variously as loss of use or detention damage . . . is sometimes loosely called demurrage, but this term is incorrect. The term demurrage technically is the contractual sum given a shipowner for the use of his ship beyond the time fixed by a charter party." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 14-6 n.27 (4th ed. 2004). Consequently, I will refer to the loss of use claimed in this case as detention damage.

quotation omitted). The Supreme Court refused to uphold the $15,000 award for loss of use, finding the evidence "insufficient." *Id*. at 134. The Court took judicial notice of the duration of "the yachting season in our northern waters," concluding that the vessel "probably would have been laid up at her wharf" for more than half the time used to calculate detention damages. *Id.* It found "not the slightest evidence" that "her owner might have desired her for use in a winter's cruise to tropical waters." *Id.* The Court additionally declined to credit testimonial estimates of the cost of loss of use because the amount "was so great as, if not to shock the conscience, at least to induce the belief that it must have been estimated by witnesses who were most friendly to the owner." *Id.*

Apart from its discussion of the evidence, the Court set the framework for its sufficiency analysis in categorical terms based on the nature of the loss. The Court acknowledged that it was "too well settled . . . to be open to question" that "the loss . . . of the use of a vessel . . . is a proper element of damage." *Id*. at 125. However, the Court stated that, as a basis for such damages:

> [There] must be a pecuniary loss, or at least a reasonable certainty of pecuniary loss, and not a mere inconvenience arising from an inability to use the vessel for the purposes of pleasure . . . . . In other words, there must be a loss of profit in its commercial sense. In all the cases in which we have allowed demurrage, the vessel has been engaged, or was capable of being engaged, in a profitable commerce, and the amount allowed was

> determined either by the charter value of such vessel, or by her actual earnings at about the time of the collision.[4]

*Id*. at 133.  There was no credible evidence that Mr. Vanderbilt had such use in mind for his yacht, the CONQUEROR.  *Id*. at 133-34.

Relatively recent appellate decisions have, with greater or lesser degrees of analysis, treated *The Conqueror*'s language as establishing that the loss of use of a private pleasure boat is not compensable.[5]  The current consensus view has been concisely

---

[4] The Supreme Court distinguished a decision by the second of the four Judges Lowell of this court awarding recreational loss damages, *The Walter W. Pharo*, 29 F.Cas. 123 (D. Mass. 1870), with the dismissive observation that "the total allowance was but $80." *The Conqueror*, 116 U.S. at 129.  It bears noting that the second Judge Lowell was considered, as Professor Chafee delicately observed, to be a jurist who

> realized keenly the human factors of a case, and had a remarkable instinct for perceiving on which side real justice lay.  One of the bar of his court said: 'He would not, unless the law and the evidence compelled him, do what he thought was a practical injustice. And it seldom happened that he found himself so compelled.  He had a marvelous talent for escaping from that difficulty.' Consequently, some called him a wayward judge, independent to the verge of willfulness in establishing justice.

Zechariah Chafee, Jr., *John Lowell, in* XI DICTIONARY OF AMERICAN BIOGRAPHY 466, 467 (1933) (internal citation omitted).

[5] *See Cent. State Transit & Leasing Corp. v. Jones Boat Yard, Inc.*, 206 F.3d 1373, 1376 (11th Cir. 2000) ("Appellant [owner of a recreational vessel] is entitled to receive loss of use damages only if able to prove, with reasonable certainty, that profits had actually been, or may reasonably be supposed to have been, lost."); *Snavely v. Lang*, 592 F.2d 296, 297 (6th Cir. 1979) ("*The Conqueror* has been interpreted as creating an iron-clad rule that under federal maritime law demurrage is not an

6

summarized as follows: "Where a pleasure craft . . . has no history of income, the owner is not entitled to damages for loss of use." *Gladsky v. Sessa*, 2007 WL 2769494, at *5 (E.D.N.Y. Sept. 21, 2007). It bears emphasizing, however, that this recent consensus among the federal courts is not consistent with earlier reservations about the scope of *The Conqueror* expressed by Judge Hand and Justice Cardozo.

Two decades after *The Conqueror* was handed down, Judge Hand, while "conced[ing] that some of the language in [*The Conqueror*], broken from its context, lends itself to [the] conclusion [that demurrage damages are not available for the loss of a pleasure craft]," found that the case "turned upon the dubiousness of the proof of value of the yacht." *The Vanadis*, 250 F. 1010, 1011 (S.D.N.Y. 1918). Observing that "[w]e are all accustomed to the purchase and sale of pleasures and recreation," he concluded that "[t]he test is, as in every other case, their value in exchange; for the purpose of the recovery is to effect the result of an exchange." *Id.* Consequently, he found "no reason to think that, if the exchange value of the yacht's use in *The Conqueror* . . .

---

allowable item of damage for loss of use of a private pleasure craft."); *Oppen v. Aetna Ins. Co.*, 485 F.2d 252, 257 (9th Cir. 1973) ("Under federal maritime law loss of use of a private pleasure boat is not a compensable item of damages."); *Thomson v. United States*, 266 F.2d 852, 856 (4th Cir. 1959) ("Demurrage is not allowable damage in a case of this sort, for valuation of the loss of use of a pleasure craft is highly speculative and immeasurable.").

had been established in the customary way, [Mr. Vanderbilt] would have had further difficulty in his recovery." *Id.*

A decade later, Justice Cardozo, who also recognized that "[t]here are statements in *The Conqueror* that may be in conflict," nevertheless observed that where "there is need of the employment of a substitute. . . . the fair market value of the hire may be an element of damage, and this whether the substitute is actually procured or not." *Brooklyn E. Dist. Terminal v. United States*, 287 U.S. 170, 175 (1932) (internal citation omitted). Speaking for a unanimous court, Justice Cardozo declined to embrace the distinction between pleasure and commercial craft:

> The vessel may be a yacht, employed for pleasure and not for business. Even then, in the judgment of many courts, the value of the use may be considered by the triers of the facts in fixing the recovery if there has been a substantial impairment of that enjoyment for which such vessels are maintained.

*Id.*

In short, both *The Vanadis* and *Brooklyn Eastern District Terminal*, while undervaluing the categorical holding, take a more nuanced view of *The Conqueror* and challenge the assumption that the loss of use of a pleasure craft is categorically speculative in nature.

### III. *THE CONQUEROR* SWAMPS THE RENAISSANCE

In their briefing before me, each party has characterized their adversary's position regarding the respective holdings of

*The Conqueror* as dicta.  The characterizations appear to be efforts to deprecate the case's alternative holdings.

*The Conqueror* held A) that mere recreational loss is not compensable and B) that any compensable loss must be sufficiently proven.  But alternative holdings are not dicta.  Dicta, as Judge Leval has observed, "is an assertion in a court's opinion of a proposition of law which does not explain why the court's judgment goes in favor of the winner."  Pierre N. Leval, *Judging Under the Constitution: Dicta about Dicta*, 81 N.Y.U.L. REV. 1249, 1256 (2006).  Both Proposition A and Proposition B are not dicta because each provides a different reason why the judgment did not go in favor of Frederick W. Vanderbilt.  The failure to satisfy either, not to mention both, was fatal to his case.

The lower federal appellate courts of the current era have consistently treated *The Conqueror*'s categorical ruling that mere recreational loss is not compensable to be dispositive.  It is a holding of the Supreme Court binding upon the lower federal courts until changed by the Supreme Court itself.  *See, e.g.*, *Agostini v. Felton*, 521 U.S. 203, 207 (1997); *Rodriquez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 534, 535 (1983).  Yet, even accepting Judge Leval's observation that "[c]ourts often give less careful attention to propositions uttered in support of unnecessary alternative holdings," 81

N.Y.U.L. REV. at 1258 n.23, the requirement of sufficient proof of any compensable loss requires comparable adherence because it also expresses the Court's reasoning in *The Conqueror* for denying damages. To provide broader context for understanding the alternative holdings and their force and merit, I will explore them in greater detail below.

### A.   *Principles of Detention Damage*

The categorical rule barring compensation for recreational loss, although binding, does not necessarily commend itself either as a necessary reading of the state of the law preceding *The Conqueror* or as a matter of policy.

*The Potomac*, 105 U.S. (15 *Otto*) 630 (1891), decided 16 years before *The Conqueror*, has been identified by Professor Schoenbaum as the source of the American rule that the "owner of a vessel damaged through the fault of another is also entitled to award for actual profits lost during the detention necessary to make repairs." THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 12-6 & n.27 (4th ed. 2004). While the use of the term "profits" connotes concern with commercial activity and *The Potomac* involved commercial loss, the Supreme Court's statement of the rule was directed to the "market price" for the vessel's use:

> In order to make full compensation and indemnity for what has been lost by the collision, *restitutio in integrum*, the owners of the injured vessel are entitled to recovery for the loss of her use while laid up for repairs. When there is a market price for such use, that price is the test of the sum to be recovered.

105 U.S. at 631-32.


Similarly, in the English case which *The Conqueror* cited as one of the earliest on the subject "Dr. Lushington [held] that 'in order to entitle a party to be indemnified for what is termed in this court a 'consequential loss,' being for the detention of his vessel, two things are absolutely necessary — actual loss, and reasonable proof of the amount.'" 166 U.S. at 125 (quoting *The Clarence*, ch. 166 E.R. 968, 970 3 W. Rob. 283, 286 (1850)). While the examples of loss cited in *The Clarence* were commercial in character, the principles of "actual loss" and "reasonable proof of the amount" were not by terms so restricted.[6]

In short, the case law before *The Conqueror* did not compel the categorical bar the case erected to recovery of recreational loss. Moreover, as a matter of policy, although recent Circuit

---

[6] Limited research has not identified any English case directly on point regarding damages for recreational loss. Nevertheless, a "working principle" discussed by Lord Justice Devlin, who later served as the President of the British Maritime Association from 1962-1976, appears to capture the current state of English law. This is the principle that:

> the owner of a vessel may get substantial, and not merely nominal, damages notwithstanding that he cannot show any loss of profit.  He has lost the use of his vessel; and whether he could have used her for pleasure or business or some other form of service, such as dredging, he is entitled to compensation for loss of use.

*The Hebridean Coast*, [1961] A.C. 545, 563 (C.A. 1960) (Devlin, L.J.).  A leading English treatise is more pointed, opining that "[t]he notorious decision of the U.S. Supreme Court in *The Conqueror* . . . would almost certainly not be followed here."  MARSDEN ON COLLISIONS AT SEA 579 n.27 (SIMON GAULT, et al eds. 13th ed. 2003).

decisions, *see supra* Note 5, have declined to adopt the positions articulated in *The Vanadis* and *Brooklyn Eastern District Terminal*, I consider those cases to have the better of the argument.  The instant case involves a disputed issue of fact regarding actual loss measurable by a market price.  The Heards had invested $125,000 and their own time and sweat equity in rebuilding the vessel.  These investments were made with the intention of using the RENAISSANCE for recreation of the type planned in the late summer and early fall of 2007.  The Heards had definite plans to use the RENAISSANCE starting the day after the Harbor Master's boat allided with it, and they sustained loss when they were unable to make use of their investment as a result.  The sole question should be whether that loss can be expressed in a market value without conjecture, surmise or speculation.

The categorical rule of *The Conqueror* results in similarly situated plaintiffs and defendants facing vastly different outcomes depending not on monetizable damages but on the character of the loss.  As another District Court with a substantial maritime practice observed when faced with this circumstance:

> It strikes one as fundamentally unfair that a yacht owner can be deprived of the use of an asset of substantial value . . . for a substantial period solely as a result of another's negligence and yet be wholly denied money damages for such loss of use simply because the asset was a pleasure craft.  One wonders why the tortfeasor should

12

> benefit from the fact that an asset owner chose to forgo commercial operations when there is far less speculative nature or other question concerning ascertainable damages . . . than there is concerning general damages in the run-of-the-mill personal injury case.

*Nordasilla Corp. v. Norfolk Shipbuilding & Drydock Corp.*, 1982 A.M.C. 99 (E.D.Va. 1981).

Despite these reservations, it is nevertheless unquestionable that "*The Conqueror* . . . [has been found] to be viable, controlling, if highly criticized, precedent" and an inferior federal court "is not in the position to rule differently though it might if it were writing on a clean slate." *Zepsa Indus., Inc. v. Kimble*, 2008 WL 4991115, at *4 (W.D.N.C. Nov. 11, 2008). As a result, despite its overreading of prior precedent and its faulty policy basis, *The Conqueror* dictates that damages are not available for the Heards' loss of recreational use of the RENAISSANCE.

    B.    *Reasonable Proof of Detention Damage for Recreational Use*

In the alternative, applying the noncategorically stated general principles of *The Potomac* and *The Clarence*, the core issue becomes whether there is reasonable proof of a market price for the amount of loss, not whether that market price is for recreational use. *See also The Conqueror*, 166 U.S. at 127 (explaining that "the best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market"). *The Conqueror*, in fact, dealt

with this core issue of sufficiency of evidence more carefully and critically than with its categorical exclusion of damages for recreational use. As *The Conqueror* observed, three witnesses for Mr. Vanderbilt attested to the value of a replacement charter but offered little by way of facts to substantiate their estimates. *Id*. at 130. The Court concluded that "estimates" by "friendly witnesses, with no practical illustrations to support them, are . . . too unsafe, as a rule, to be made the basis of a judicial award." *Id*. at 134.

Whatever may have been the sufficiency of the evidence adduced in *The Conqueror*, evidence submitted by the Heards here related to the amount of the loss[7] is sufficient to raise a question of fact regarding the market value of the Heard's recreational loss. In an affidavit, the principal of a Newport, Rhode Island charterer states that his business is the only one to offer vessels comparable to the RENAISSANCE for bareboat (*i.e.*, without a captain) charter in Massachusetts, Rhode Island,

---

[7] This evidence was belatedly produced through the affidavit of Brian Blank, the principal of Bareboat Sailing Charters, Newport, Rhode Island, submitted in connection with summary judgment. The Heards neglected their obligation under Fed. R. Civ. P. 26 to make timely disclosure of their expert. I would, if it were material to further proceedings, however, be prepared to permit the evidence to be considered in connection with summary judgment and trial on condition that Northern Assurance be afforded an adequate opportunity to develop rebuttal evidence. By contrast, I note that the claim of loss of a computer, some liquor and certain food items also belatedly asserted by the Heards in the summary judgment proceedings before me, has not been sufficiently demonstrated and consequently I conclude that claim is unavailing as a matter of law.

14

or Connecticut, and that he offered such vessels — 49 foot sloops — for charter at $5,000 per week.  Indeed, this is the charterer whom the Heards identified as having a substitute vessel, albeit one beyond their means, available after the allision.  On this evidence, the cost for chartering the boat for 10 weeks in the summer of 2007 could be found to be $50,000.  However, the Heards' belated expert submission does not constitute a dispositive demonstration of damage for loss of use of the RENAISSANCE because Northern Assurance has not had the opportunity to meet the Heards' proof in this procedural setting. *See supra* Note 7.

Justice Cardozo noted that, in cases such as this, "[a] wide range of judgment is conceded to the triers of the facts in the choice of the standard to be applied and in the method of applying it." *Brooklyn E. Dist. Terminal*, 287 U.S. at 176. Whether evidence proffered is sufficient to constitute "reasonable proof" as to the amount of a loss is, itself, determined based on the type of loss and attending circumstances. I find the Heards here have established a *prima facie* showing of the requisite loss.  But if this case were to proceed, I would, of course, permit Northern Assurance to present both an evidentiary challenge to the Heards' expert and its own rebuttal expertise evidence on the issue of market value and mitigation.

## IV. CONCLUSION

Regardless of my finding that the Heards can proffer a sufficient basis for determining the market price of a replacement vessel, I am obligated, in light of the application of the categorical rule derived from *The Conqueror,* to grant Northern Assurance's motion for summary judgment solely on the basis that the Heards' use of the vessel was to be recreational.

I would be less than candid if I did not also register my sense that the categorical rule of *The Conqueror* finds its source in the resistance of the Supreme Court to enabling one of the richest men in late nineteenth century America to recover, on questionable evidence, for the "inconvenien[t]" loss of one of his many recreational diversions.[8]  166 U.S. at 133.  That categorical rule has, however, a broad wake, depriving the working couple in this case recovery for a monetizable loss of the central recreational activity to which they have devoted considerable personal efforts over a number of years.  In this, the categorical rule created for a Vanderbilt falls harshly on the Heards, calling to mind Anatole France's description of the "majestic equality of the laws, which forbid rich and poor alike to sleep upon the bridges . . . ."   ANATOLE FRANCE, THE RED LILY 95

---

[8] One American treatise has also recognized this source in arguing that "there is no longer a need to preserve the *Conqueror's* dislike of conspicuous consumption by denial of detention damages."  NICHOLAS J. HEALY & JOSEPH C. SWEENEY, THE LAW OF MARINE COLLISION 373 (1998).

(Frederic Chapman ed., Winifred Stephens trans., John Lane Co. 1908).

That having been said, I must GRANT Northern Assurance's motion for summary judgment (Doc. No. 28) and the Heards' motion (Doc. No. 32) must be DENIED.  Judgment shall enter for Northern Assurance declaring its entitlement to the entire insurance proceeds from the Town of Winthrop deposited in the Registry of this Court.

                                        ***/s/ Douglas P. Woodlock***  
                                        DOUGLAS P. WOODLOCK  
                                        UNITED STATES DISTRICT JUDGE